**United States District Court**
For the Northern District of California

1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                    NORTHERN DISTRICT OF CALIFORNIA
7
8    LINDSAY FOCHT,                              No. C-10-0906 EMC
9              Plaintiff,
10        v.                                     **ORDER GRANTING DEFENDANT'S**
                                                 **MOTION TO DISMISS**
11   SOL MELIA S.A., *dba Sol Melia Hotels &*
     *Resorts*,                                  **(Docket No. 3)**
12
              Defendant.
13   _____/
14
15
16        Plaintiff Lindsay Focht has filed suit against Defendant Sol Melia, S.A., ("SM") asserting a
17   claim for negligence based on injuries that she sustained after falling from a zip line at the Hotel
18   Melia Puerto Vallarta, a hotel located in Mexico.  In April 2010, SM moved to dismiss for lack of
19   personal jurisdiction or, in the alternative, for forum non conveniens.[1]  The parties stipulated to
20   limited written discovery on jurisdiction.  Subsequently, Ms. Focht asked for leave to take additional
21   jurisdictional discovery, which the Court permitted.  *See* Docket No. 33 (order).  The jurisdictional
22   discovery now has been completed, and thus the motion to dismiss for lack of personal jurisdiction
23   is now ripe for resolution.  Having considered the parties' briefs and accompanying submissions, as
24   well as the oral argument of counsel and all other evidence of record, the Court hereby **GRANTS**
25   SM's motion to dismiss for lack of personal jurisdiction.
26
27   _____
28        [1] In its moving papers, SM also asked for a dismissal based on insufficient service of
     process.  However, SM subsequently withdrew that part of the motion to dismiss.  *See* Docket No.
     30 (notice).

United States District Court

For the Northern District of California

# I.   FACTUAL & PROCEDURAL BACKGROUND

In conjunction with the motion to dismiss, both parties have submitted written materials for the Court's consideration, including materials that Ms. Focht obtained through discovery. Those materials reflect as follows.

SM is a Spanish corporation with a principal place of business in Spain. *See* Docket No. 5 (Pardo Decl. ¶ 2). SM owns or manages, either directly or indirectly, hotels under a variety of brands such as Sol, Melia, ME, and Paradisus. Collectively, the hotels are a part of the brand known as the Sol Melia Hotels and Resorts. *See* Docket No. 72 (Blake Decl., Ex. 4) (response to Interrogatory No. 9). These hotels shall hereinafter be referred to as the "Sol Melia brand hotels." *See* Docket No. 5 (Pardo Decl. ¶ 2).

There is no dispute that SM does not directly own or directly operate the brand hotel in Mexico where Ms. Focht was injured. *See* Docket No. 5 (Pardo Decl. ¶ 19). Rather, that hotel is directly owned and directly operated by SM affiliates. More specifically, the hotel is owned by Bisol Vallarta, S.A. de C.V., and the hotel is operated by Operadora Mesal, S.A. de C.V. Both companies are Mexican corporations with principle places of business in Mexico. SM owns a majority interest of the parent company of the parent company of Bisol Vallarta. SM directly and indirectly owns 100% interest in Operadora Mesal. *See* Docket No. 5 (Pardo Decl. ¶ 21); Docket No. 72 (Blake Decl., Ex. 4) (responses to Interrogatory Nos. 4-6).

In addition to the above, there is no dispute that SM does not own or manage, either directly or indirectly, any hotel in California. *See* Docket No. 5 (Pardo Decl. ¶ 2). Indeed, consistent with this fact, there is no dispute that SM is not authorized to do business in California, does not own real or personal property in California, does not maintain any banking or financial account in California, and does not pay taxes or file tax returns in California. *See* Docket No. 5 (Pardo Decl. ¶¶ 3-6).

While SM does not own or manage any hotel in California, California residents do stay at the Sol Melia brand hotels. Relying on the opinion of an expert, Ms. Focht claims that, each year, approximately 50,000 California residents stay at the brand hotels or purchase timeshares there, resulting in $11 million in annual revenue. SM disputes these numbers. It also disputes that all of the revenues made by the brand hotels can be attributed to SM for purposes of personal jurisdiction.

**United States District Court**
For the Northern District of California

SM maintains a website at www.solmelia.com. The website, which is available in nine languages, permits interested users to make reservations directly with the Sol Melia brand hotels. Potential guests are not charged for booking a reservation; they pay at the hotel after their stay. Besides www.solmelia.com, Sol Melia creates and owns websites for each hotel individually. Each website is linked to www.solmelia.com. *See* Blake Decl., Ex. 4 (response to Interrogatory No. 42). In 2008, there were approximately 4,000 website bookings from California; the same is true for 2009. *See* Blake Decl., Ex. 4 (responses to Interrogatories Nos. 46-48). There is no evidence that any of the websites targets California residents.

In addition to the website, SM maintains two loyalty programs – a customer loyalty program known as MAS and a travel agent loyalty program known as Club Amigos – plus a customer database, which contains information about customers of the Sol Melia brand hotels.

- With respect to the MAS program, from 2007 to 2009, there were approximately 14,000 to 19,000 members who were California residents. *See* Blake Decl., Ex. 4 (response to Interrogatory No. 19). During that same period, approximately 5,000 to 8,000 received e-mail and newsletters about the program. *See* Blake Decl., Ex. 4 (response to Interrogatory No. 20).

- With respect to the Club Amigos program, from 2007 to 2009, there were approximately 1,100 to 1,400 members who were California residents. *See* Blake Decl., Ex. 4 (response to Interrogatory No. 21). During the same period, approximately 200 to 500 received e-mail and newsletters about the program. *See* Blake Decl., Ex. 4 (response to Interrogatory No. 22).

- As for the customer database, in 2008, there were 4,463 California customers in the database out of 6,049,265 customers total (*i.e.*, 0.074% of the total). In 2009, there were 4,303 California customers in the database out of 3,356,959 customers total (0.13%). *See* Blake Decl., Ex. 4 (response to Interrogatory No. 12).

Other contacts that SM has with California include a contract for internet advertising with Google, a California-based company, and use of Facebook and Twitter, also California-based companies, to promote the brand hotels.

United States District Court

For the Northern District of California

1    Finally, SM has three affiliates which are specifically identified by Ms. Focht as having

2    contacts with California that are attributable to SM.  Those affiliates are Sol Group Corporation

3    ("SGC"), Sol Melia Vacation Club LLC ("SMVC"), and Vacation Club Services Inc. ("VCSI").

4    SMVC and VCSI are hereinafter referred to collectively as the Vacation Club entities.

## II.   DISCUSSION

A.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss for lack of personal jurisdiction.  The plaintiff has the burden of establishing that jurisdiction is proper.  *See Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  Where a court does not conduct an evidentiary hearing, and only written materials are presented for the court's consideration, then a plaintiff need only make a prima facie showing of jurisdictional facts to withstand a motion to dismiss.  *See Fiore v. Walden*, 657 F.3d 838, — (9th Cir. 2011); *Mavrix*, 647 F.3d at 1223.  "[I]n deciding whether a prima facie showing has been made, 'the court resolves all disputed facts in favor of the plaintiff.'"  *Fiore*, 657 F.3d at —.

B.   General Jurisdiction – General Principles

Because there is no federal statute authorizing personal jurisdiction, the Court must apply the law of the state in which it sits.  *See Mavrix*, 647 F.3d at 1223.  California's long-arm statute is coextensive with federal due process requirements, *see* Cal. Code Civ. Proc. § 410.10 (providing that "[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States"), and therefore

> the jurisdictional analyses under state law and federal due process are
> the same.  For a court to exercise personal jurisdiction over a
> nonresident defendant consistent with due process, that defendant
> must have "certain minimum contacts" with the relevant forum "such
> that the maintenance of the suit does not offend 'traditional notions of
> fair play and substantial justice.'"

*Mavrix*, 647 F.3d at 1223.

In the instant case, Ms. Focht does not contend that there is specific jurisdiction over SM. Rather, she claims only general jurisdiction.  "In the context of general jurisdiction, minimum contacts exist where a defendant has 'substantial' or 'continuous and systematic' contacts with the

forum state, even if the case is unrelated to those contacts." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1171 (9th Cir. 2006). The contacts must "'approximate physical presence.'" *Id.* at 1169.

> To determine whether a nonresident defendant's contacts are sufficiently substantial, continuous, and systematic, [a court] consider[s] their "[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets." The standard for general jurisdiction "is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world."

*Mavrix*, 647 F.3d at 1223-24. In short, the level of contact with the forum state necessary to establish general (as opposed to specific) jurisdiction is "quite high." *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 380 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991).

The Supreme Court has found general personal jurisdiction over a non-resident defendant in only one case – *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952). *See Mavrix*, 647 F.3d at 1224. In fact, the Supreme Court

> has recently described *Perkins* as the "textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum." The facts of *Perkins* illustrate the nature and extent of the contacts required for general jurisdiction. The defendant was a Philippine corporation whose mining operations were suspended while the Japanese occupied the Philippines during World War II. The corporation's president, who was also its general manager and principal stockholder, returned to his home in Ohio, where he ran a corporate office. The president kept business files in Ohio; handled corporate correspondence from Ohio; drew employees' salaries from accounts in Ohio banks and distributed paychecks; held directors' meetings while he was in Ohio; and "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." Plaintiff's "cause of action . . . did not arise in Ohio and [did] not relate to the corporation's activities there." But because of the nature and extent of the corporation's activities in the state, "Ohio was the corporation's principal, if temporary, place of business." The Court therefore upheld the exercise of personal jurisdiction over the corporation in Ohio.

*Id.*

///

///

///

United States District Court

For the Northern District of California

In contrast, the Supreme Court declined to find general jurisdiction in *Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408 (1984). There, the plaintiff argued that a Colombian corporation was subject to general jurisdiction in Texas.

> [E]ven though the corporation sent its CEO to Texas to negotiate a contract; spent more than $4 million to purchase approximately 80 percent of its fleet of aircraft, as well as spare parts and accessories, from a Texas supplier; sent pilots for training in Texas; sent management and maintenance personnel to Texas for technical consultation; and received over $5 million in contract payments from funds drawn on a Texas bank,

*Mavrix*, 647 F.3d at 1225, the Supreme Court concluded that general jurisdiction was lacking. Notably, the Court concluded that "mere purchases, even if occurring at regular intervals" and in significant dollar volumes, were not sufficient to establish general jurisdiction. *Helicopteros*, 466 U.S. at 418. The Court further held that such purchases even if accompanied by employee trips into the forum were insufficient. *See id.* at 417 (citing *Rosenberg Bros. & Co. v. Curtis Brown & Co.*, 260 U.S. 516 (1923)).

C.      SM Contacts Identified by Ms. Focht

There is no dispute that SM is a Spanish corporation with its principal place of business in Spain. *See* Compl. ¶ 2; *see also* Docket No. 5 (Pardo Decl. ¶ 2). Nevertheless, Ms. Focht argues that there is general jurisdiction over SM in California based on the following alleged contacts with the forum.[2]

• Maintenance of sales offices in California.

• Annual revenue of at least $11 million from 50,000 California residents who stay at the Sol Melia brand hotels and/or purchase their timeshares.

• Operation of an interactive website (www.solmelia.com), which is viewed and used in California.

• Operation of a customer loyalty program (MAS) and a travel agent loyalty program (Club Amigos), which have thousands of California members who receive promotional materials.

---

[2] Neither party has argued that the Court should look at SM's contacts with the United States rather than contacts with California in determining whether the courts of the United States should have jurisdiction over SM.

United States District Court
For the Northern District of California

1   •      Maintenance of a consumer database which includes thousands of California residents.

2   •      A contract for internet advertising with Google, a California-based corporation, and use of

3          Facebook and Twitter, both California-based corporations, to promote the brand hotels.

4          In addition to the contacts identified above, Ms. Focht argues that the contacts of three

5   entities affiliated with SM – *i.e.*, SGC and the two Vacation Club entities (*i.e.*, SMVC and VCSI) –

6   should be attributed to SM.

7          Each of these contacts is addressed below.  The Court shall first evaluate the contacts

8   individually and only then collectively.  It takes this approach because, as discussed below, in some

9   instances, there are serious deficiencies with the individual contacts which affect how the Court may

10  consider the contacts collectively.

11  D.     Sales Offices in California

12         According to Ms. Focht, SM maintains sales offices in California and therefore has a

13  physical presence in California and is doing business in California.  In support of this claim, Ms.

14  Focht relies primarily on the 2009 hotel directory and the www.solmelia.com website.  *See* Docket

15  No. 72 (Blake Decl., Ex. 9) (page 210 of hotel directory); Docket No. 72 (Blake Decl., Ex. 10)

16  (website).  The problem for Ms. Focht is that the above evidence does not indicate that SM

17  *specifically* holds itself out as having sales offices in California.  Rather, the evidence simply reflects

18  that there are sales offices for the Sol Melia Hotels and Resorts (a brand), not that they belong to or

19  are operated by SM.  It appears that the California sales offices at issue is maintained by SGC,

20  which is an entity legally separate from SM.  Whether SGC's contacts may nevertheless be

21  attributed to SM for purposes of personal jurisdiction are discussed in Part II.J, *infra*.

22  E.     Annual Revenue

23         Ms. Focht claims that SM has significant contacts with California because it derives at least

24  $11 million in annual revenue from 50,000 California residents who stay at Sol Melia brand hotels

25  and/or purchase their time-shares.  SM contests these numbers, arguing that the expert opinion

26  ///

27  ///

28  ///

United States District Court

For the Northern District of California

offered by Ms. Focht is flawed.[3]  SM further argues that it is improper to attribute all of the revenues earned by the brand hotels to SM.

Even if the Court were to accept Ms. Focht's numbers, as it must in the context of this motion, there are two problems.  First, on this record, not all the revenues may be attributed to SM.  Second, even if they were attributable, the revenues earned from California and associated contacts are not sufficient to establish general jurisdiction.

    1.    <u>Attribution of Affiliates' Contacts</u>

There is a fundamental problem with Ms. Focht's assumption that all of the revenues of the Sol Melia brand hotels may be attributed to SM for purposes of personal jurisdiction.  For those hotels that SM directly owns, attribution is reasonable.  But SM does not directly own all of the brand hotels.  The record reflects that, out of the Sol Melia brand hotels, only 30% are owned by SM; the remainder are leased (17%), managed (48%), or franchised (5%).  *See* Pardo Depo. at 61-62; Docket No. 72 (Blake Decl., Ex. 8) (first page of 2009 sustainability report).  For the 30% that are owned, it appears that SM is the direct owner of only a fraction (*e.g.*, some hotels in Spain); the remaining hotels are owned indirectly through affiliates of SM.  *See* Pardo Depo. at 61-62.

For purposes of this opinion, the Court assumes that, for the Sol Melia brand hotels that are not directly owned, there is some sort of parent-subsidiary relationship (*e.g.*, a hotel is a subsidiary of a subsidiary of SM, or a management company is a subsidiary of SM).  However, a parent-subsidiary relationship by itself is not enough to attribute the contacts of the Sol Melia brand hotels to SM.  The Ninth Circuit has expressly stated that

> [t]he existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum.  As the Supreme Court recently explained in the context of assessing corporate separateness for purposes of liability:

---

[3]  In response to an interrogatory, SM stated that:

- In 2007, 17,426 out of 46,419,730 total guests were California residents (0.0375%).
- In 2008, 10,354 out of 43,750,992 total guests were California residents (0.0237%).
- In 2009, 4,207 out of 22,742,215 total guests were California residents (0.0185%).

*See* Blake Decl., Ex. 4 (response to Interrogatory No. 11).

United States District Court

For the Northern District of California

> It is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts. This recognition that the corporate personalities remain distinct has its corollary in the well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.
>
> In considering a parent corporation's potential liability under CERCLA, the Supreme Court distinguished "a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility." In so doing, the Supreme Court articulated a generally applicable principle that a parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is "consistent with the parent's investor status." Appropriate parental involvement includes: "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures."

*Doe v. Unocal Corp.*, 248 F.3d 915, 925-26 (9th Cir. 2001).

The Court acknowledges that, in certain circumstances, the contacts of a subsidiary may be attributed to a parent for purposes of personal jurisdiction – more specifically, when the subsidiary is the alter ego of the parent or when the subsidiary is the agent of the parent. *See Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920-21 (9th Cir. 2011). However, in the instant case, Ms. Focht has made no attempt in her papers, or even at the hearing, to argue either alter ego or agency for the brand hotels.[4] Rather, she has made only an alter ego or agency argument for SGC and the Vacation Club entities.

To the extent Ms. Focht contends that the mere fact that revenues eventually make their way back to SM is sufficient for attribution of contacts, *see* Tr. at 7; *see also* Pardo Depo. at 34-39 (explaining that revenues go first to the hotel to cover its needs, then to another affiliated company

---

[4] To the extent Ms. Focht argues that SM suggests the brand hotels are its hotels (*e.g.*, through the www.solmelia.com website, the hotel directory, or the financial report), that is simply a reflection of the parent-subsidiary relationship or sharing of a brand name. Neither is enough to justify the attribution of the hotels' contacts to SM for purposes of personal jurisdiction analysis. *See, e.g.*, *Day v. Harrah's Hotel & Casino Las Vegas*, No. 10cv1746-WQH-JMA, 2010 U.S. Dist. LEXIS 116817, at *9 (S.D. Cal. Nov. 2, 2010) (stating that evidence that companies share the same brand name "is insufficient to establish that the . . . entities at issue have anything other than a 'relationship between a parent company and its subsidiaries'").

1   above the hotel, and only then to SM if there is any revenue left over), the Court does not agree.

2   First, she has cited no authority in support of that proposition.  Second, that position is

3   fundamentally flawed because, in any parent-subsidiary relationship, at least some revenues will

4   presumably make their way back to the parent.  Allowing attribution on this circumstance alone

5   would run counter to the baseline principle that a parent-subsidiary relationship in itself is not

6   enough to hold a parent responsible for its subsidiary's contacts with the distant forum.

7         To be sure, attribution of revenue to SM might be reasonable for hotels that SM manages

8   where SM has control over the generation of such revenues.  However, there is no evidence in the

9   record of what SM does as a management company.  There is no evidence that SM directs and

10  controls marketing in California of the brand hotels in a manner which warrants attributing to SM

11  the $11 million in purported California revenue earned by SM affiliates.  Instead, Ms. Focht only

12  presented evidence as to California marketing by SGC, which as discussed below is not sufficient to

13  support general jurisdiction over SM.

14        Because there is no basis to attribute all of the Sol Melia brand hotel contacts to SM – at

15  least based on the record presented – the Court cannot attribute the brand hotels' purported $11

16  million in annual revenue from California customers to SM.  While some portion of that figure could

17  arguably be attributed to SM, Ms. Focht has offered no way for the Court to estimate with any

18  reasonable accuracy what that portion would be.

19        2.    Revenues Not Sufficient to Establish General Jurisdiction

20        Even if the $11 million annual revenue could be attributed to SM, it is not enough to

21  establish general jurisdiction.  Although that volume of sales is substantial in absolute terms, it is

22  insignificant in relative terms.  The $11 million figure represents only a tiny fraction – 0.75% – of

23  SM's worldwide sales.  *See* Opp'n at 3 (asserting that, in 2009, SM had revenues of over $1.5

24  billion).  Moreover, the Court has no information indicating that this revenue is a significant portion

25  of the California travel market.  *Compare Tuazon*, 433 F.3d at 1167 (finding general jurisdiction

26  where, among other things, defendant had net sales of $145-240 million each year and a market

27  share in the forum of 29-31%).

28

United States District Court

For the Northern District of California

Ms. Focht contends that percentages (as opposed to absolute dollars) are meaningless, citing in support *Lakin v. Prudential Securities, Inc.*, 348 F.3d 704 (8th Cir. 2003). In *Lakin*, the Eighth Circuit stated that the "[p]ercentage of a company's sales in a given state are generally irrelevant" because "[m]any companies conduct millions of dollars in sales worldwide yet only do a small percentage of their sales in any one state." *Id.* at 709. It added that "our relevant inquiry is not whether the percentage of a company's contacts is substantial for that company; rather, our inquiry focuses on whether the company's contacts are substantial for the forum."

This Court acknowledges that the percentage of a defendant's sales in the forum is not dispositive. However, the Court disagrees with Ms. Focht's position that relative significance of the revenue is entirely irrelevant. Indeed, the Ninth Circuit has held to the contrary. In *Shute*, for example, the court found no general jurisdiction based on, among other factors (*e.g.*, limited marketing efforts in the forum), the fact that the sale of vacation cruises to residents of Washington accounted for only 1% (approximately) of defendant's business. *See Shute*, 897 F.2d at 381. In so holding, the court cited its earlier decision in *Congoleum Corp. v. DLW Aktiengesellschaft*, 729 F.2d 1240 (9th Cir. 1984), which rejected general jurisdiction even where the defendant had engaged in sales and marketing efforts in the forum. *See Shute*, 897 F.2d at 381.

Similarly, in *Johnston v. Multidata Systems International Corp.*, 523 F.3d 602 (5th Cir. 2008), the Fifth Circuit found no general jurisdiction over the foreign defendant even though it had $1.5-8.75 million in annual sales to Texas customers over a five-year period because sales accounted for only 0.5-2.5% of total global sales of the defendant. *See id.* at 614. The court cited in support: *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694 (5th Cir. 1999), where no general jurisdiction was found even though the defendant derived millions of dollars a month in revenue from Texas residents; *Dalton v. R&W Marine, Inc.*, 897 F.2d 1359 (5th Cir. 1990), which held that there was no general presence in the forum despite the fact that the defendant earned over 12% of its revenues from sales in the state; and *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir. 1987), which held that sale of over $250 million of products to Texas customers did not constitute systematic and continuous contacts with Texas.

**United States District Court**
For the Northern District of California

1    To establish general jurisdiction, more than the sale of $11 million to Californians is

2  required.  *Cf. Helicopteros*, 466 U.S. 408 (finding purchases of significant dollar volume insufficient

3  to establish general jurisdiction).

4  F.    Website

5       Ms. Focht contends that the www.solmelia.com website is another significant contact that

6  SM has with California.  The fact that the website is accessible by California residents is not enough

7  to establish general jurisdiction.  *See Mavrix*, 647 F.3d at 1227 (stating that, "[t]o permit the exercise

8  of general jurisdiction based on the accessibility in the forum of a non-resident interactive website

9  would expose most large media entities to nationwide general jurisdiction").  While Ms. Focht

10  points out that hundreds of thousands of California residents have in fact accessed the website for

11  one to two million page views, *see* Docket No. 72 (Blake Decl., Ex. 4) (response to Interrogatory

12  Nos. 46-47), she has failed to explain why those numbers have any real significance absent an

13  indication that, *e.g.*, SM was targeting a California audience with its website (as opposed to an

14  international one, especially given the nine languages available on the website) or that the

15  interactive website produced a substantial portion of its revenue.  *See, e.g.*, *Martino-Valdes v.*

16  *Renaissance Hotel Management Co. LLC*, No. :10-1278 (DRD), 2011 U.S. Dist. LEXIS 127487

17  (D.P.R. Aug. 25, 2011) (taking into account whether the defendant "has done anything to encourage

18  people in [the forum] to visit the site" and examining whether the "web site was directed at [the

19  forum] more than any other place in the country"); *In re Enterprise Rent-A-Car Wage & Hour*

20  *Employment Practices Litigation*, 735 F. Supp. 2d 277 (W.D. Pa. 2010) (stating that, "'[w]here a

21  website is interactive and general jurisdiction is at issue, the court must analyze whether the website

22  is targeted specifically to Pennsylvanians and whether the website is central to the defendant's

23  business in Pennsylvania'").  Analogously, in *Elayyan v. Melia*, 571 F. Supp. 2d 886 (N.D. Ind.

24  2008), the court noted that "[c]ourts treat hotel websites that allow the placing of reservations

25  similarly to other forms of national advertising, such as toll-free reservation hotlines, which are

26  themselves insufficient to establish general jurisdiction."  *Id.* at 901; *cf. Gonzales v. Palo Alto Labs,*

27  *Inc.*, No. C 10-2456 MEJ, 2010 U.S. Dist. LEXIS 110295, at *12-13 (N.D. Cal. Oct. 6, 2010)

28

**United States District Court**

For the Northern District of California

1    (stating that "advertisements in national magazines do not rise to the level of purposeful contact with

2    a forum required by the Constitution in order to exercise personal jurisdiction over the advertiser").

3        To be sure, California residents have not simply accessed the SM website; they have made

4    actual use of the website to book reservations for the Sol Melia brand hotels. *See Coremetrics, Inc.*

5    *v. AtomicPark.com, LLC*, 370 F. Supp. 2d 1013, 1022-24 (N.D. Cal. 2005) (looking at volume of

6    internet sales, as well as their frequency). However, the number of bookings is not that significant –

7    approximately 4,000 each year. *See Manley v. Air Canada*, 753 F. Supp. 2d 551, 558 n.2 (E.D.N.C.

8    2010) (indicating that personal jurisdiction could be based on internet sales but the sales would have

9    to be more than de minimis). As a point of comparison, in *Keeton v. Hustler Magazine, Inc.*, 465

10    U.S. 770 (1984), the Supreme Court held there was no general jurisdiction over a Ohio corporation

11    in New Hampshire even though that corporation circulated 10,000 to 15,000 copies of its magazines

12    per month in the forum. *See id.* at 772, 779 n.11. Moreover, presumably the California revenues

13    generated by these contacts is incorporated into the $11 million discussed above.

14    G.      Loyalty Programs

15        Ms. Focht argues next that SM has significant California contacts based on two loyalty

16    programs that it runs: (1) a customer loyalty program (MAS) and (2) a travel agent loyalty program

17    (Club Amigos).

18        With respect to the MAS program, from 2007 to 2009, there were approximately 14,000 to

19    19,000 members who were California residents. *See Blake Decl., Ex. 4* (response to Interrogatory

20    No. 19). From 2007 to 2009, approximately 5,000 to 8,000 received e-mail and newsletters about

21    the program.[5] *See Blake Decl., Ex. 4* (response to Interrogatory No. 20). There is no information as

22    to how many total members there are in the MAS program or how many total members received e-

23    mail and newsletters.

24        With respect to the Club Amigos program, from 2007 to 2009, there were approximately

25    1,100 to 1,400 members who were California residents. *See Blake Decl., Ex. 4* (response to

26

27         [5] For both the MAS program and the Club Amigos program, there is no information as to how often e-mail and/or newsletters were sent to California members, and therefore, to the extent

28    Ms. Focht claims that communications were regularly sent, that claim is rejected.

1   Interrogatory No. 21).  From 2007 to 2009, approximately 200 to 500 received e-mail and

2   newsletters about the program.  As above, there is no information as how many total members there

3   are in the Club Amigos program or how many total members received e-mail and newsletters.

4          While the absolute numbers of California members are not insignificant, the Court must bear

5   in mind that there are millions of residents in the state and thus these programs likely reach only a

6   tiny percentage of the California travel market.  Similarly, although the Court is without information

7   about the total members in each program, it is likely that the California component of the total

8   program is small.  The Sol Melia brand hotels have a worldwide audience and, even by Ms. Focht's

9   calculations, California revenues make up only 0.75% of SM's total sales.  In contrast, in *Cubbage*

10  *v. Merchent*, 744 F.2d 665 (9th Cir. 1984), the Ninth Circuit held that general jurisdiction was

11  lacking over a nonresident hospital even where, *inter alia*, approximately 26% of the hospital's

12  patients (within a four-month period) were from the forum state.  *See id.* at 667.

13         While the fact that only a small percentage of California members participate might be less

14  important if SM had actually targeted California residents to become members, *but see id.* (holding

15  no general jurisdiction even though, *inter alia*, approximately 26% of the hospital's patients were

16  from the forum and the hospital advertised in a telephone directory distributed in the forum), the

17  record contains no evidence of such targeting.  Nor does the record contain any information as to

18  how the California residents became members of the loyalty programs.

19         In the absence of this information, the Court is simply left with evidence that some of the

20  California members – numbering in the thousands – received email and/or newsletters.  These

21  contacts are neither substantial nor systematic and continuous enough to give rise to general

22  jurisdiction.  As noted above, in *Keeton*, the Supreme Court indicated that there was no general

23  jurisdiction over a Ohio corporation in New Hampshire even though that corporation circulated

24  10,000 to 15,000 copies of its magazines per month in the forum.  *See Keeton*, 465 U.S. at 772, 779

25  n.11.  In addition, in *Gates Learjet Corp. v. Jensen*, 743 F. 2d 1325 (9th Cir. 1984), the Ninth Circuit

26  held that simply making telephone calls and sending telexes and letters to the forum "are not

27  activities which support a finding of general jurisdiction."  *Id.* at 1331.  Sending e-mails and

28  newsletters are ultimately no different from making telephone calls or sending telexes and letters.

**United States District Court**
For the Northern District of California

H.     Customer Database

Ms. Focht also argues that SM has significant California contacts based on a database that SM maintains which contains information about customers of the Sol Melia brand hotels.  In response to an interrogatory, SM stated that, in 2008, there were 4,463 California customers in the database out of 6,049,265 customers total (0.074%).  In 2009, there were 4,303 California customers in the database out of 3,356,959 customers total (0.13%).  *See* Blake Decl., Ex. 4 (response to Interrogatory No. 12).

As above, the small number and percentage of California customers in the database weighs against general jurisdiction, particularly in the absence of evidence suggesting that SM has targeted California residents.  Furthermore, the numbers above do not show that SM actually has contacts with the California customers as a result of maintaining the database.  The 2009 sustainability report cited by Ms. Focht simply states that 2 out of 6 million customers "have indicated that they are willing to receive commercial information by e-mail."  Docket No. 72 (Blake Decl., Ex. 8) (2009 sustainability report) (simply stating that 2 out of 6 million customers "have indicated that they are willing to receive commercial information by e-mail").

I.     Google, Facebook, and Twitter

As additional California contacts, Ms. Focht points to the fact that SM has transacted business with several California-based companies, *i.e.*, Google, Facebook, and Twitter.  The Ninth Circuit has repeatedly made a distinction between doing business *with* California and doing business *in* California.  Only the latter gives rise to general jurisdiction.  *See Mavrix*, 647 F.3d at 1226 (explaining that a defendant's "business relationships with other California companies constitute 'doing business with California,' but not necessarily 'doing business in California'").

J.     SGC

Sol Group Corporation ("SGC") is an entity owned entirely by Sol Group, B.V., a Netherlands corporation.  Sol Group, B.V. in turn is entirely owned by SM.  In short, SGC is a subsidiary of a subsidiary of SM.  *See* Mateos Depo. at 10-11; Docket No. 81 (Mateos Decl. ¶ 4).  SGC provides services for SM for which SGC is paid by SM.  SGC also provides services for entities *other than* SM, more specifically, for Sol Melia brand hotels in the Americas (approximately

**United States District Court**
For the Northern District of California

1    20 to 30 hotels, none of which SM owns directly) and for hotel management companies in the

2    Americas.  Like SM, these entities also pay SGC for its services.  *See* Mateos Depo. at 11-13, 70;

3    Docket No. 81 (Mateos Decl. ¶ 6).  The services that SGC provides for SM specifically are as

4    follows: (1) development; (2) legal work; and (3) sales, *i.e.*, promotion for hotels in other areas

5    outside of the Americas.  *See* Mateos Depo. at 71-72 (stating that "[s]ometimes they promote hotels

6    that are not located in the Americas, so whatever they can request[;] [i]f they need a certain

7    promotion in the U.S. for hotels in Europe, for example, this kind of things").  SGC currently has

8    one sales agent, Carlos Sosa, who is located in California.  Mr. Sosa does sales/promotion for the

9    West Coast region, which includes California, Arizona, Nevada, Utah, Wyoming, Idaho, Montana,

10   Alaska, and Hawaii.  *See* Sosa Depo at 26-27.  Since 2004, SGC has had five other employees (now

11   terminated) who have resided in California.  *See* Docket No. 72 (Blake Decl., Ex. 13) (Stip. Fact ¶

12   5).

13           Ms. Focht argues that, even though SGC is simply a subsidiary of a subsidiary of SM, its

14   contacts should be attributable to SM for personal jurisdiction purposes under either an alter ego or

15   agency theory.  If Ms. Focht is correct, SGC's activity and representation in California might add a

16   qualitative dimension to the jurisdictional analysis additional to the California revenues discussed

17   above.  However, Ms. Focht fails to establish on this record the propriety of attribution here.

18           1.    Alter Ego

19           Ms. Focht does not contend that SGC is SM's alter ego on the basis that SM controls every

20   facet of SGC's business from broad policy decisions to routine matters of day-to-day operation.

21   Rather, Ms. Focht argues alter ego because SM and SGC have merged their identities under the

22   same brand name.  *See* Opp'n at 21.  This theory of alter ego is without merit.  In *Day*, the court held

23   that the sharing of a brand name was not enough to make the subsidiary's contacts attributable to the

24   parent.  *See Day*, 2010 U.S. Dist. LEXIS 116817, at *9.  The Court agrees.  The authorities cited by

25   Ms. Focht are unavailing.  For example, in *Paneno v. Centres for Academic Learning Abroad Ltd.*,

26   118 Cal. App. 4th 1447 (2004), the state court found that the agency test was met and not the alter

27   ego test.  Furthermore, the court mentioned the companies "confusing use of the same generic trade

28   name" only in the context of finding that the companies were deliberately trying to game the system

**United States District Court**
For the Northern District of California

1   by setting up two related entities to avoid answering a claim for liability in the forum. *See id.* at

2   1457. Here, Ms. Focht has failed to establish the requisite elements of alter ego (including an

3   increased level of control by SM over SGC).

4        2.    <u>Agency</u>

5        The Court also finds Ms. Focht's agency theory unconvincing. The Ninth Circuit has

6   summarized the agency test as follows.

> [The] test is predicated upon a showing of the *special importance* of
> the services performed by the subsidiary:
>
> > The agency test is satisfied by a showing that the
> > subsidiary functions as the parent corporation's
> > representative in that it performs services that are
> > sufficiently important to the foreign corporation that if
> > it did not have a *representative* to perform them, the
> > corporation's own officials [or another entity
> > designated by the corporation] would undertake to
> > perform substantially similar services.

13   *Bauman*, 644 F.3d at 920, 922 n.13 (emphasis in original). "In addition, this test requires the

14   plaintiffs to show an element of control, albeit not as much control as is required to satisfy the 'alter

15   ego' test." *Id.*

16        In the instant case, Ms. Focht has not made out a prima facie case that SM would step in or

17   have another representative step in to perform SGC's functions in SGC's absence. Although SGC's

18   general counsel (Marisol Mateos) testified in her deposition that SM does not handle any of the

19   promotional and marketing services that SGC provides in the United States, *see* Mateos Depo. at 49-

20   50, that does not necessarily mean that SM would step in or have someone else step in to do the

21   work if SGC was not there. For instance, there is no evidence about how often SM asked SGC to do

22   promotional work. In addition, there is no evidence about, *e.g.*, the number of United States sales

23   that SGC made with respect to hotels outside of the Americas or the portion of SM's business

24   generated by SGC. *See Bauman*, 644 F.3d at 922 (noting that, "[w]hen this suit was filed, the

25   United States market accounted for 19% of the sales of Mercedes-Benz vehicles worldwide, and [the

26   subsidiary's] sales in California alone accounted for 2.4% of [the parent's] total worldwide sales [–]

27   [the parent] simply could not afford to be without a U.S. distribution system"); *Modesto City

28   Schools v. Riso Kagaku Corp.*, 157 F. Supp. 2d 1128, 1133, 1135 (E.D. Cal. 2001) (finding that the

United States District Court

For the Northern District of California

subsidiary was the parent's sole sales and marketing conduit in the United States *and* that the United States was "a vitally important market"; "[n]early 20% of [the parent's] production moves through [the subsidiary] [;] [t]hus, the United States' market and [the subsidiary's] role in servicing it is crucial to [the parent's] organizational life").

Even if the Court were to find a prima facie case of agency (including the element of control), that would not in and of itself establish personal jurisdiction. The Court would simply be permitted to attribute the agent's contacts to the principal. It must still independently evaluate whether those contacts give rise to personal jurisdiction. In terms of the contacts that may be considered, the Court may look at only those contacts that SGC made on behalf of SM, and not those contacts that SGC made on behalf of its other clients, (*i.e.*, the Sol Melia brand hotels located in the Americas and the hotel management companies in the Americas) whose business cannot on the basis of the current record be attributed to SM. In other words, the Court may not take into account the contacts that SGC made on behalf of its other clients in the absence of evidence indicating that *they too* were agents of SM.

In terms of SGC's contacts with California, it does have a sales agent, *i.e.*, Mr. Sosa, located in California. It also has had, in the past, five other California-based employees. But even assuming that all of these employees performed some work on behalf of SM (in addition to other entities), the Ninth Circuit has held that the physical presence in the forum state of a sales agent, or even a substantial sales force, is not enough to give rise to general jurisdiction. *See Mavrix*, 647 F.3d at 1226 (stating that "we have held that even the physical presence in the forum state of a sales agent or a 'substantial sales force' is insufficient to establish general jurisdiction"); *see also Shute*, 897 F.3d at 381 (holding that active marketing in the forum was insufficient to establish general jurisdiction); *cf. Helicopteros*, 466 U.S. at 418 (finding sales accompanied by employee trips into the forum insufficient to establish general jurisdiction).

Furthermore, Mr. Sosa's total sales for California amounted to approximately $2.3 million in 2008 and $880,000 in 2009 (*see* Docket No. 72 (Blake Decl., Ex. 28)); this magnitude is not substantial in relative terms. Moreover, there is no evidence as to what portions of these sales went to SM rather than its affiliates.

18

United States District Court

For the Northern District of California

As a final point, the Court notes that, in its analysis, it has taken into account the sur-reply that Ms. Focht filed.[6]  It has also taken into consideration the Eleventh Circuit decisions in *Meier v. Sun International Hotels, Ltd.*, 288 F.3d 1264 (11th Cir. 2002), and *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357 (11th Cir. 2006).  Like the instant case, *Meier* and *Stubbs* each involved a plaintiff who filed suit in the United States against a foreign entity(ies) after he suffered a personal injury at a hotel located abroad.  In each case, the appellate court concluded that there was general jurisdiction in Florida over the nonresident defendant(s) based on direct contacts by the defendant(s) and indirect contacts of entities which were properly considered agents of the defendant(s) for personal jurisdiction purposes.  But the record facts here are distinguishable from *Meier* and *Stubbs*.

For example, in *Meier*, the subsidiaries were actually located within the forum.  *See Meier*, 288 F.3d at 1267.  Similarly in *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357 (11th Cir. 2006), the subsidiary was incorporated in the forum.  *See id.* at 1361.  In the instant case, SGC is not located within California.

In addition, in *Meier*, the defendants' wholly-owned subsidiaries in Florida solicited and coordinated hotel reservations for visitors to the Atlantis resort in the Bahamas, coordinating over 50% of all guests, the majority of whom were from the United States.  *See id.* at 1272.  One subsidiary coordinated *all* advertising and marketing for Atlantis, purchased goods in the United States for Atlantis, and provided day-to-day accounting services for Atlantis.  *See id.*  The subsidiary maintained and managed bank accounts in Florida and conducted business solely for the defendant group.  *See id.* at 1273.  As such, the Court concluded the subsidiaries were "mere instrumentalities" of the defendants.  No comparable record was made in the instant case with respect to the brand hotels.

Furthermore, in *Meier* as well as in *Stubbs*, the direct contacts by the nonresident defendant differed in material ways.  In *Meier*, the nonresident defendant had seven bank accounts in the

---

[6]  SM objected to the filing of the sur-reply.  While the objection was warranted, the Court has decided, in the interest of justice, to consider the sur-reply to ensure that there is nothing in the brief that affects its personal jurisdiction analysis.

United States District Court

For the Northern District of California

forum, issued a press release directing all inquiries to a company officer with a forum telephone number, and had an attorney/agent for service in the forum. *See Meier*, 288 F.3d at 1274 n.13. In *Stubbs*, the nonresident defendant had extensive direct contacts, for example, the defendant "maintained numerous separate commercial relationships with Florida-based entities, including travel and vacation agencies, lawyers, insurance brokers, advertisers, and a host of construction and home decor companies"; "a significant portion of [the defendant's] vendors operated in Florida" (the list of Florida vendors was hundreds of pages long); and the defendant "held at least six bank accounts in Florida through which it issued over 1,600 checks in the fourteen months before the district court's ruling." *Stubbs*, 447 F.3d at 1362. The direct contacts asserted by Ms. Focht in the instant case are markedly weaker than in *Meier* and *Stubbs*. All of the circumstances above render *Meier* and *Stubbs* distinguishable.

K.   Sol Melia Vacation Club

Time-share units are available for sale in at least some of the Sol Melia brand hotels. The time-share units are owned in the first instance by the hotels. They are then sold by each hotel to a local time-share entity. The time-share entities taken collectively are known by the trade name Sol Melia Vacation Club. *See* Henry Depo. at 37, 43-44. Sol Melia Vacation Club LLC ("SMVC") is a holding company for the various time-share entities, plus another entity known as Vacation Club Services, Inc. ("VCSI"). *See* Henry Depo. at 44. VCSI provides services to the various time-share entities, such as sales and marketing, human resources, intellectual technology, and financial services. *See* Henry Depo. at 45. VCSI has a call center which it uses to make calls to prospective buyers. *See* Henry Depo. at 49-50. VCSI has a telemarketing license in California so that it may conduct these calls to California residents. *See* Henry Depo. at 72. SMVC – which as noted above covers VCSI as well as the various time-share entities – is owned by Hoteles Sol Melia, S.L., which in turn is owned by SM. *See* Henry Depo. at 20-21; *see also* Docket No. 72 (Blake Decl., Ex. 4) (response to Interrogatory No. 18).

When a person buys a time share, he or she becomes a member of the Sol Melia Vacation Club. *See* Henry Depo. at 24. In 2009, there were approximately 350 California residents who were members of that club. In addition to the Sol Melia Vacation Club, there is another vacation club

**United States District Court**
For the Northern District of California

1   known as the Melia Vacation Club.  The Melia Vacation Club has approximately 876 California

2   members.[7]  *See* Docket No. 72 (Blake Decl., Ex. 4) (response to Interrogatory No. 17).  In response

3   to an interrogatory, SM states that, for the years 2007 to 2009, California residents generated the

4   following revenue for SMVC (not SM) for purchase of memberships in the Sol Melia Vacation

5   Club.[8]

6           2007   $1,648,516.20

7           2008   $2,212,218.00

8           2009   $1,835,288.47

9   *See* Blake Decl., Ex. 4 (response to Interrogatory No. 18).

10          Similar to above, Ms. Focht argues that the contacts of SMVC/VCSI should be attributed to

11  SM under an alter ego or agency theory.  The alter ego argument is problematic for the same reasons

12  as stated above.  As for the agency argument, SMVC cannot be considered an agent as it is simply a

13  holding company.  *See Modesto*, 157 F. Supp. 2d at 1132 (pointing out that, in *Doe*, the Ninth

14  Circuit "found that plaintiffs failed to make out a prima facie case that the foreign corporation's

15  holding company subsidiaries were its general agents for jurisdictional purposes where neither

16  performed any services or activities for the foreign corporations; but rather, merely held assets").  As

17  for VCSI, even if it should be considered SM's agent for jurisdictional purposes, its contacts are not

18  substantial or continuous and systematic enough to give rise to general jurisdiction.  VCSI's

19  telemarketing license simply establishes that VCSI does business *with* California and not *in*

20  California.  *See Mavrix*, 647 F.3d at 1226 (explaining that a defendant's "business relationships with

21  other California companies constitute 'doing business with California,' but not necessarily 'doing

22  business in California'").  There is no evidence that VCSI targets California residents for sales,

23  including through the call center.  Nor is there any evidence about what sales to California residents

24

25

26          [7]  It appears that there are no new members for the Melia Vacation Club because owners of
     time-shares now become members of SMVC (*i.e.*, the Melia Vacation Club is the old vacation club
27   but still in existence).  *See* Henry Depo. at 33-35.

28          [8]  Although not entirely clear, it appears that the figures do not include revenue related to the
     Melia Vacation Club.

1  came from VCSI's actions specifically (as opposed, *e.g.*, to actions taken by the local time-share

2  entities).

3  L.        Contacts Taken Collectively

4         The contacts discussed above have essentially been considered individually.  But even taking

5  into account the contacts collectively – as the Court must – many of them must be disregarded

6  because of the problems identified above (*e.g.*, the California revenue is based on revenue made by

7  all Sol Melia brand hotels; there does not appear to any concrete evidence that SM has used the

8  consumer database to contact California customers; SGC's contacts should not all be attributed to

9  SM by virtue of SGC's actions taken on behalf of other SM affiliates).

10         The remaining contacts (*e.g.*, unknown revenues made by Sol Melia brand hotels directly

11  owned by SM, website bookings, communications with loyalty program customers, business with

12  Google, use of Facebook and Twitter, VGSI's contacts, those SGC contacts made on behalf of SM

13  specifically) even if aggregated, are not enough to approximate SM's physical presence in California

14  necessary for general jurisdiction.  At best, SM generates $11 million in annual revenue from

15  California for its worldwide operations – a tiny fraction of SM's global revenue and in all likelihood

16  a small portion of the California travel market.

17         The circumstances here constitute a less substantial showing than that in cases in which the

18  Ninth Circuit has refused general jurisdiction.  For instance, as noted above, in *Shute*, the court

19  found no general jurisdiction even though the defendant advertised in the local media, mailed

20  brochures and paid commissions to travel agents, conducted promotional seminars, and sold

21  vacation cruises to residents of Washington, which accounted for approximately 1% of defendant's

22  business.  *See Shute*, 897 F.2d at 381.  In *Cubbage*, the court found no general jurisdiction over the

23  defendant hospital even though, *inter alia*, 18% of the hospital's employees were California

24  residents, the hospital maintained a yellow pages listing in a telephone directory distributed in

25  California, and approximately 26% of the hospital's patients were California residents (during a

26  four-month period).  The court also found no general jurisdiction over the defendant doctors even

27  though the doctors maintained white page listings in the same directory, one doctor saw about 14

28  California patients per week (12%), and the doctors had California Medi-Cal numbers and received

**United States District Court**
For the Northern District of California

1  reimbursement from state of California for a small number of patients covered by the Medi-Cal

2  program.  *See Cubbage*, 44 F.2d at 667.  Finally, as noted above, the Supreme Court has rejected an

3  assertion of general jurisdiction despite a showing of substantial financial connection with the forum

4  (*Helicopteros*) and has found general jurisdiction in only one case (*Perkins*) where the defendant

5  had located central aspects of its business in the forum.

6  **III.   CONCLUSION**

7     For the foregoing reasons, the Court concludes that, based on the record presented, Ms.

8  Focht has failed to make out a prima facie case of general jurisdiction.  Accordingly, SM's motion to

9  dismiss for lack of personal jurisdiction is dismissed.  The Court emphasizes that it is not

10  unsympathetic to Ms. Focht's circumstances and that it does not hold that there could never be

11  personal jurisdiction over SM in this forum.  Moreover, it does not address specific jurisdiction.[9]

12  The Court only holds that, based on the record presented before it, Ms. Focht has not made an

13  adequate showing to establish general jurisdiction under the applicable "exacting standards."

14  *Mavrix*, 647 F.3d at 1223-24.

15     The only issue remaining is whether the dismissal should be with or without leave to amend.

16  The Court concludes that, under the circumstances, a dismissal without leave to amend is proper.

17  SM first filed its motion to dismiss on April 29, 2010 – *i.e.*, more than a year and a half ago.  Ms.

18  Focht has had more than a year to conduct jurisdictional discovery, and she has never contended that

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ───────────────

28    [9] Ms. Focht does not assert specific jurisdiction under a "tortious striking distance" theory of the "arising out of" prong of that test.  *Cf. Shute*, 897 F.3d at 386.

she was not given an adequate opportunity to take jurisdictional discovery or that she needed additional discovery in order to oppose SM's motion.  Given this situation and the fact that this is a 12(b)(2) motion, not a 12(b)(6) motion, a dismissal without leave to amend is appropriate.

The Clerk of the Court is directed to enter judgment in favor of SM and close the file in this case.

This order disposes of Docket No. 3.

IT IS SO ORDERED.

Dated:  January 19, 2012

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California

24